**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JUL 0 9 2012 ★

**BROOKLYN OFFICE**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X

CLEOPATRA ROSIOREANU,

                  Plaintiff,

      -against-

THE CITY OF NEW YORK,

                Defendant.

-----------------------------------------------------X

**MEMORANDUM AND ORDER**
**07 CV 2925 (LB)**

**BLOOM, United States Magistrate Judge:**

      Plaintiff, Cleopatra Rosioreanu, brings this *pro se* action against defendant City of New York pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. ("Title VII"). The Court held a jury trial from March 12, 2012 to March 14, 2012, and the jury returned a verdict for plaintiff on her retaliation claim under Title VII.[1]  Defendant now moves for judgment as a matter of law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, or in the alternative, for a new trial or for remittitur pursuant to Rule 59 of the Federal Rules of Civil Procedure.  For the following reasons, defendant's motion is denied.

## BACKGROUND

      Plaintiff is a civil structural engineer licensed by the State of New York.  (Tr. 30.[2])  Plaintiff was hired to work in the Bureau of Water and Sewer Operations of the New York City Department of Environmental Protection in December 1996 as a design engineer.  (Id.)  On July 1, 2001, plaintiff requested a transfer to the Engineering Audit Office of the Department of Environmental Protection.  (Tr. 31.)  Following an interview with James Mahaney, the Deputy Director of Construction Payments in the Engineering Audit Office, plaintiff's request for a

---

1 The parties consented to a Magistrate Judge for all purposes pursuant to 28 U.S.C. § 636(c).  (Docket entry 102.)
2 "Tr." refers to the transcript of the jury trial held from March 12, 2012 until March 14, 2012.

transfer was approved.  (Tr. 31; Ex. 5.1.)   Plaintiff was sixty years old at the time she transferred to the Engineering Audit Office.   (Tr. 32.)   As a Civil Engineer/Audit Engineer in the Engineering Audit Office, plaintiff performed audits of construction payments and job order contract payments.  (Tr. 31, 146; Ex. 5.1.)   Roy Durig was the Director of the Engineering Audit Office and James Mahaney was plaintiff's direct supervisor.  (Ex. 5.1.)  Plaintiff was the only female engineer with the Engineering Audit Office in 2001 and testified that "men dominated [the] world in the engineering field."  (Tr. 107, 118, 143; Ex. 5.1.)

After four months on the job, plaintiff began working on a project related to the watershed division's billing system.  (Tr. 32.)  On November 7, 2001, plaintiff went to a meeting in Kingston, New York to present her proposal to change the billing system to the director in charge. (Tr. 32-33, 258.)  Plaintiff was scheduled to attend the meeting with Mahaney.  (Tr. 32.) However, as plaintiff could not drive and Mahaney could not attend the meeting, Muzaffar Jamal, a co-worker within the Engineering Audit Office, was sent with plaintiff to the Kingston meeting. (Tr. 33; Ex. 5.1.)  Plaintiff and Jamal arrived at the meeting more than one hour late because Jamal worked on his private engineering business while plaintiff waited in the car on the way to the meeting.  (Tr. 33.)  During the meeting, Jamal "improperly and rudely interfered with [plaintiff's] presentation in a very unprofessional and arrogant fashion."  (Tr. 33.)  Plaintiff testified that she "firmly believe[s] that he behaved in this particular manner also because I am a woman" and that "if I was a man he will never have doing his personal business with me in the car."  (Tr. 106, 313.)

Upon their return, plaintiff immediately complained to Mahaney and Durig about Jamal making her late to the meeting and Jamal's "disrespect" during the meeting.  (Tr. 33.)  Durig confirmed that plaintiff complained that "there was some sort of argument up in Kingston where

2

Jamal interrupted the conversation - - Cleopatra's conversation and she got annoyed at him, there was some verbal altercation." (Tr. 148.)  When Jamal presented a different version of events to the supervisors, plaintiff asked Durig to investigate the incident, including "the way [Jamal] actually treated [her]." (Tr. 33, 35.)  Durig testified that he spoke to plaintiff and Jamal and they both said they did not want to take the matter any further. (Tr. 148.)  Plaintiff testified that Durig and Mahaney "took the man word against my word." (Tr. 35.)  Plaintiff further testified that "since that day, Mahaney turned against me and he has started to mock me, to undermine to broken English, to belittle and pester me . . . to subject me to increasing scrutiny, marginalization and criticism." (Tr. 35.)  Plaintiff testified that the Kingston meeting started "a long ordeal of harassment, intimidation and malicious retaliation that eventually forced [her] to withdraw from EAO in May 2003." (Tr. 33.)  Plaintiff specifically stated that the Kingston meeting "start[ed] the problem . . . [and] exposed me to abusive behavior of Mr. M. Jamal and get continuous persecution from Mr. Mahaney." (Tr. 105.)  Durig confirmed that plaintiff and Mahaney had a very good relationship when she first started in the Engineering Audit Office, but their relationship "went downhill" after the Kingston meeting. (Tr. 146-147, 172.)

Plaintiff testified that Mahaney and Durig's "unfounded evaluation[s]" of her performance at the Engineering Audit Office were part of the harassment she suffered following the Kingston meeting. (Tr. 104.)  For the period July 1, 2001 to December 31, 2001, Mahaney gave plaintiff an overall rating of conditional on her performance evaluation.[3] (Ex. A.)  Mahaney stated that plaintiff "exhibits rigidity and poor interaction with others" and that her "performance – after 6 months of service – is not up to expectation." (Id.)  Plaintiff appealed the evaluation on February 4, 2002. (Tr. 39.)  For the period January 1, 2002 to March 15, 2002, Mahaney also gave

---

3 The ratings available on Department of Environmental Protection performance evaluations include unratable, unsatisfactory, conditional, good, very good, and outstanding. (Ex. A.)

plaintiff an overall rating of conditional on her performance evaluation.   (Ex. 9.)   Mahaney stated that plaintiff "exhibits a pattern of poor performance and behavior" and "resists direction."   (Id.)   On March 15, 2002, a board convened to address plaintiff's appeal of her first performance evaluation.   (Ex. 20; Ex. B.)   The board voided the two evaluations performed by Mahaney from July 1, 2001 to March 15, 2002 and transferred plaintiff from the supervision of Mahaney to Deputy Director Louis Gorozdi effective March 18, 2002.   (Ex. 20; Ex. B.)   Gorozdi testified that plaintiff was transferred to his supervision because of a conflict between plaintiff and Mahaney.   (Tr. 449.)   Plaintiff testified that she "was complaining under the appeal . . . because I couldn't find another way to complain directly about what I perceived as management abuse. Nobody stopped Director Mahaney to harass me, to come into my work."   (Tr. 58-59.)

On March 25, 2002, plaintiff complained to the Deputy Director of Human Resources and requested an investigation of what happened at the November 7, 2001 meeting in Kingston.   (Tr. 43-45.)   On June 10, 2002, plaintiff met with Human Resources Director Zoe Ann Campbell and complained about her performance evaluations, Mahaney's conduct, and what had happened with Jamal at the Kingston meeting.   (Ex. 17; Ex. 18; Tr. 369, 393, 396.)   On October 3, 2002, plaintiff met with Deputy Commissioner Louis Tazzi and complained about her performance evaluations, Mahaney, and Jamal.   (Ex. 14; Tr. 287.)   Unsatisfied with Tazzi's response to her complaints, plaintiff complained to the Chief of Staff, Shauna Grob, on November 25, 2002 regarding Mahaney's harassment.   (Tr. 59, 288-289.)   Plaintiff testified that "after a year and a half with somebody harassing me, like Mahaney did for one year and a half, I complained to all the chain of command, ten to fifteen memos."   (Tr. 111.)

For the period March 18, 2002 to May 31, 2002, Gorozdi gave plaintiff overall ratings of good on her interim performance evaluations.   (Ex. 10; Ex. 11.)   Gorozdi testified that plaintiff

did her "work as good or better than the other people that were doing the same type of work." (Tr. 449.) Gorozdi further testified that Mahaney continued to go over plaintiff's work while she was under his supervision and that he complained to Durig about it. (Tr. 453-54.) While under Gorozdi's supervision, plaintiff testified that Mahaney "removed me from the training," "was following me all the time, criticizing me, having objections all the time," and "never stopped interfering in my work." (Tr. 104.) Gorozdi confirmed that although plaintiff was placed under his management and supervision, he "could not effectively accomplish the task that the Board charged [him] with [Mahaney] being involved in [his] supervision area." (Tr. 455.) Gorozdi testified that during a meeting he attended with Mahaney and Durig on July 29, 2002, Mahaney objected to a memorandum prepared by plaintiff, but without "express[ing] his opinion why he felt the way he did." (Tr. 456.) When another deputy director, Harold Buchberg, agreed with the position in plaintiff's memorandum, Mahaney "got up and kicked" Buchberg. (Tr. 457; Ex. 5.1.) Following the meeting, Gorozdi asked Durig to remove plaintiff from his supervision. (Tr. 457.) Plaintiff was then transferred to the direct supervision of Durig. (Tr. 56, 157.) Under Durig's supervision, plaintiff started working more on job order contract payments and made complaints to Durig as well as Durig's supervisor, First Deputy Commissioner David Tweedy, about what she perceived as the approval of "illegal payments" by the Engineering Audit Office. (Tr. 56-57, 113-115, 165-166; Ex. E, F, 51.)

In March 2003, plaintiff requested a transfer out of the Engineering Audit Office. (Tr. 295.) Durig transferred plaintiff from the Engineering Audit Office to the Bureau of Water and Sewer Operations, effective May 12, 2003. (Ex. 49.) In May 2003, a taskforce met for the first time to address job order contract payments; plaintiff was not placed on the taskforce. (Tr. 207, 332.) As plaintiff did not receive her evaluation from Durig for the time she was under his

supervision, plaintiff requested in January 2004 that an evaluation be performed.  (Tr. 71-72.)
Plaintiff testified that she had to complain up the chain of command in order for Durig to finally
perform her evaluation.  (Tr. 91.)  On May 18, 2004, Durig gave plaintiff an overall rating of
conditional on her performance evaluation for the period January 1, 2003 to May 9, 2003.  (Ex.
H.)  Durig stated that plaintiff "has difficulty working with others," was "lacking" in her "ability
to work with minimal supervision," and "has poor interpersonal relationship skills, which
interfered with her auditing functions."  (Id.)  Plaintiff again appealed the performance
evaluation, and on July 22, 2004, the appeal committee changed plaintiff's overall rating from
conditional to good.  (Ex. 64; Ex. I.)

## PROCEDURAL HISTORY

Plaintiff commenced this *pro se* action against the New York City Department of
Environmental Protection, James Mahaney, and Roy Durig pursuant to Title VII and the Age
Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* ("ADEA") on July 17, 2007.
(Docket entry 1.)  After the parties had completed discovery and the Court had set the briefing
schedule for defendants' motion for summary judgment, counsel appeared on plaintiff's behalf.
(Docket entries 18, 23 and 24.)  The Court re-opened discovery and plaintiff's counsel amended
the complaint.  (Docket entries 28 and 30.)  Plaintiff filed a second amended complaint on
November 7, 2008, and defendants answered the second amended complaint.  (Docket entries 33
and 36.)  Following the completion of discovery on April 13, 2009, defendants moved for
summary judgment and plaintiff's counsel opposed the motion.  (Docket entries 41, 48, and 53.)
After defendants' motion for summary judgment was fully-briefed, plaintiff's counsel moved to
withdraw from the case and the Court granted counsel's request.  (Docket entries 58 and 59.)

By Memorandum and Order dated September 20, 2010, the Court granted in part and

denied in part defendants' motion for summary judgment. (Docket entry 68.) The Court dismissed plaintiff's Title VII claims based on discrete events during her employment with the Engineering Audit Office and the Bureau of Water and Sewer Operations, plaintiff's age and national origin discrimination claims, plaintiff's claims against defendants Mahaney and Durig, and plaintiff's claims under New York State and New York City law. (Id.) The Court denied summary judgment on plaintiff's hostile work environment and retaliation claims under Title VII arising from her employment with the Engineering Audit Office. (Id.) The Court also substituted the City of New York for the Department of Environmental Protection as the proper defendant to this action. (Id.) By Memorandum and Order dated January 27, 2011, the Court denied defendants' and plaintiff's motions for reconsideration. (Docket entry 89.)

The parties filed their proposed joint pretrial order on May 4, 2011 and consented to a magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c). (Docket entries 101 and 102.) After the Court was unable to find *pro bono* counsel to volunteer to represent plaintiff at trial, the Court held five conferences over the course of approximately three months to prepare the case for trial. (Docket entries 108, 110, 118, 124, and 129.) On February 29, 2012, the Court granted in part and denied in part defendant's motion *in limine*. (Docket entry 120.) At the final pretrial conference on March 6, 2012, the Court addressed the parties' proposed jury instructions and provided the parties with its jury instructions and verdict sheet for their review pursuant to Rule 51(b) of the Federal Rules of Civil Procedure. (Docket entry 129.) The Court held a conference to finalize the jury instructions after the second day of trial and neither plaintiff nor defendant had any objections. (Tr. 355-356.)

The Court held a jury trial from March 12, 2012 to March 14, 2012. (Docket entries 131, 133, and 134.) In addition to testifying herself, plaintiff called three witnesses to testify at trial:

7

Andrew Moss, Zoe Ann Campbell, and Louis Gorozdi.   Defendant did not cross-examine plaintiff's witnesses and defendant called Roy Durig as its only witness.   At the close of plaintiff's case, defendant moved for judgment as a matter of law and specified the grounds of the motion as required by Rule 50(a)(2) of the Federal Rules of Civil Procedure.[4]   (Tr. 468-472.) The Court denied defendant's motion and sent plaintiff's claims to the jury.   (Tr. 472-473.)

The jury returned a verdict for defendant on plaintiff's gender-based hostile work environment claim, but returned a verdict for plaintiff on her retaliation claim and awarded her $100,000 in compensatory damages.   (Docket entry 137.)   The Clerk of Court entered a judgment in favor of plaintiff on March 16, 2012.   (Docket entry 138.)   On April 12, 2012, defendant moved for judgment as a matter of law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, or in the alternative, for a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure.[5]   (Docket entry 144.)   Plaintiff opposes defendant's motion and defendant has replied.   (Docket entry 149, Pl.'s Aff. in Opp.; docket entry 150, Reply Mem.)   Plaintiff requests leave to file a surreply and attaches her surreply to her letter request.   (Docket entry 151.) Defendant moves to strike plaintiff's surreply.   (Docket entry 152.)   As the Court did not authorize plaintiff to file a surreply and defendant did not raise any new arguments in its reply, plaintiff's request to file a surreply is denied and defendant's motion to strike plaintiff's surreply is granted.   The Court shall not consider the arguments raised in plaintiff's surreply.

---

4 Defendant renewed its Rule 50 motion before the case was submitted to the jury and the Court denied the motion. (Tr. 475.)   The renewed motion was made immediately after the first motion because defendant's only witness, Roy Durig, was called out of turn to accommodate his medical treatment.   (Tr. 140.)
5 The judgment was entered against defendant on March 16, 2012 and the instant motion was filed on April 12, 2012. Thus, defendant's motion is timely under Rules 50(b) and 59(b) of the Federal Rules of Civil Procedure.

## DISCUSSION

### I.    Motion for Judgment as a Matter of Law

The standard for a motion for judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure "generally imposes a heavy burden on a movant, who will be awarded judgment as a matter of law only when 'a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'"   Cash v. County of Erie, 654 F.3d 324, 333 (2d Cir. 2011) (quoting Fed. R. Civ. P. 50(a)(1)).   "A movant's burden in securing Rule 50 relief is particularly heavy after the jury has deliberated in the case and actually returned its verdict."   Cross v. N.Y. City Transit Auth., 417 F.3d 241, 248 (2d Cir. 2005).   "Where, as here, a jury has deliberated in a case and actually returned its verdict, a district court may set aside the verdict pursuant to Rule 50 only where there is 'such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him.'"   AMW Materials Testing, Inc. v. Town of Babylon, 584 F.3d 436, 456 (2d Cir. 2009) (quoting Cross, 417 F.3d at 248).   "In short, a Rule 50 motion may be granted only if the court, viewing the evidence in the light most favorable to the non-movant, concludes that 'a reasonable juror would have been compelled to accept the view of the moving party.'"   Cash, 654 F.3d at 333 (quoting Zellner v. Summerlin, 494 F.3d 344, 371 (2d Cir. 2007)).   "In reviewing a Rule 50 motion, a court may consider all the record evidence, but in doing so it 'must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence.'"   Cross, 417 F.3d at 248 (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)).   Although there is an abundance

9

of caselaw on the standards for Rule 50 motions, it is clear that each case must be determined on its own facts.

Defendant argues that plaintiff failed to establish a prima facie case of retaliation under Title VII because she failed to proffer sufficient evidence that she engaged in any protected activity.  To establish a prima facie case of retaliation under Title VII, a plaintiff "must show (1) that she participated in a protected activity, (2) that she suffered an adverse employment action, and (3) that there was a causal connection between her engaging in the protected activity and the adverse employment action."  Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 110 (2d Cir. 2010) (citation omitted).  "The law protects employees in the filing of formal charges of discrimination as well as in the making of informal protests of discrimination, 'including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or society in general, and expressing support of co-workers who have filed formal charges.'"  Matima v. Celli, 228 F.3d 68, 78-79 (2d Cir. 2000) (quoting Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990)); see Sclafani v. PC Richard & Son, 668 F. Supp. 2d 423, 437 (E.D.N.Y. 2009) ("[I]nformal complaints to supervisors constitute protected activity under Title VII.").  "[I]n order to recover for retaliation for having filed such a complaint, the plaintiff need not prove that her underlying complaint of discrimination had merit."  Lore v. City of Syracuse, 670 F.3d 127, 157 (2d Cir. 2012) (citations omitted).  "An employee 'need not establish that the conduct she opposed was in fact a violation of Title VII, but rather, only that she had a good faith, reasonable belief that the underlying employment practice was unlawful.'"  Gorzynski, 596 F.3d at 111 n.8 (quoting Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir. 1996)).  "The reasonableness of the plaintiff's belief is to be assessed in light of the totality of

10

the circumstances." <u>Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.</u>, 136 F.3d 276, 292 (2d Cir. 1998) (citation omitted).

The trial record reflects that plaintiff complained immediately, and continued complaining for a year and a half, about her treatment by a co-worker at a meeting in Kingston, New York on November 7, 2001. From November 2001 until she transferred out of the Engineering Audit Office in May 2003, plaintiff complained to all levels of the Department of Environmental Protection, including Engineering Audit Office Director Roy Durig, the Human Resources Deputy Director, Human Resources Director Zoe Ann Campbell, Deputy Commissioner Louis Tazzi, Chief of Staff Shauna Grob, and First Deputy Commissioner David Tweedy about, *inter alia*, Jamal's conduct towards her during the Kingston meeting, harassment by her supervisor James Mahaney, negative performance evaluations, and improper auditing of job order contract payments. (Tr. 39, 43-45, 58-59, 91, 113-115, 287-289, 369, 393, 396; Ex. E, F, I, 14, 17, 18, 51.)

Plaintiff claims that her complaint in November 2001 to Mahaney and Durig regarding Jamal's conduct during the Kingston meeting constituted protected activity under Title VII and caused Mahaney to harass her for the next year and a half. (Pl.'s Aff. in Opp., pp. 8-10.) Regarding Jamal's conduct during the Kingston meeting, plaintiff testified that Jamal "improperly and rudely interfered with [her] presentation in a very unprofessional and arrogant fashion." (Tr. 33.) Plaintiff also testified that they arrived more than one hour late to the meeting because Jamal worked on his private engineering business on the way to the meeting while she was made to wait in the car. (Tr. 33.) Plaintiff testified that "I firmly believe that he behaved in this particular manner also because I am a woman" and that "if I was a man he will never have doing his personal business with me in the car." (Tr. 106, 313.) Plaintiff's testimony left much unsaid about what specifically happened at the Kingston meeting and about her interactions with Jamal before the

11

Kingston meeting.[6]  However, upon returning from Kingston, plaintiff immediately complained to her supervisors, Mahaney and Durig, about Jamal making her late to the meeting and Jamal's "disrespect" during the meeting.  (Tr. 33.)   When Jamal presented a different version of events to the supervisors, plaintiff asked Durig to investigate the incident, including "the way [Jamal] actually treated [her]."  (Tr. 33, 35.)  Plaintiff testified that Durig and Mahaney "took the man word against my word."  (Tr. 35.)

Jamal's conduct on November 7, 2001 was not sufficiently severe or pervasive to constitute a hostile work environment under Title VII.  See McGullam v. Cedar Graphics, Inc., 609 F.3d 70, 79 (2d Cir. 2010) ("[A] plaintiff seeking to establish a Title VII hostile work environment claim must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'") (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)); Kaytor v. Elec. Boat Corp., 609 F.3d 537, 547 (2d Cir. 2010) ("Isolated incidents generally will not suffice to establish a hostile work environment unless they are extraordinarily severe.") (citations omitted).   However, plaintiff did not have to prove that her complaint regarding Jamal's conduct had merit under Title VII to prevail on her retaliation claim. Lore, 670 F.3d at 157.  As the only female engineer in the Engineering Audit Office at the time, plaintiff believed that Jamal's rude and disrespectful behavior at the Kingston meeting was motivated by her gender and she complained to her supervisors about the incident.   When her complaint went unaddressed by her immediate supervisors, plaintiff continued complaining about Jamal's conduct to higher levels within the Department of Environmental Protection over the next year and a half.   Drawing all inferences from the evidence in her favor and considering the totality

---

6 Plaintiff testified that *after* the Kingston meeting, she no longer spoke with Jamal "because it was my protest and until the situation is clarified I don't have to expose myself to the same situation."   (Tr. 94.)

of the circumstances, a jury could and **did** find that plaintiff had a good faith, reasonable belief that she was opposing unlawful gender discrimination when she complained about Jamal to Mahaney and Durig in November 2001.[7]  See Khan v. HIP Centralized Lab. Servs., Inc., No. CV-03-2411 (DGT), 2008 U.S. Dist. LEXIS 76721, at *5-6 (E.D.N.Y. Sept. 17, 2008) (denying defendant's motion for judgment as a matter of law on plaintiff's retaliation claim because "the jury could find that Khan reasonably believed that his complaints about Ghirardi's comments were a protected activity, in light of the evidence that these comments persisted even after Khan told Ghirardi that her reference to Khan and his co-workers as 'ladies' made him feel as if he was being discriminated against in his workplace on the basis of his gender"); Pappas v. Watson Wyatt & Co., No. 3:04-CV-304 (EBB), 2008 U.S. Dist. LEXIS 21996, at *14-17 (D. Conn. Mar. 20, 2008) (denying defendant's motion for judgment as a matter of law on plaintiff's retaliation claim because "the jury could reasonably have concluded that Pappas reasonably and in good faith believed that she was engaged in protected activity" when she complained about the excessive attention paid to her by her supervisor "even though she did not explicitly describe it in . . . terms [of sexual harassment] at the time"); Marchisotto v. City of New York, No. 05 Civ. 2699 (RLE), 2007 U.S. Dist. LEXIS 27046, at *16 (S.D.N.Y. Apr. 11, 2007) (denying defendant's motion for judgment as a matter of law on plaintiff's retaliation claim because plaintiff "testified about

---

7 A complaint regarding a single harassing comment may not be considered protected activity.  See Reed, 95 F.3d at 1179 n.12 (noting that "we do not suggest, much less decide, that one comment, standing alone, could support a reasonable belief that an employee was suffering unlawful, discriminatory employment conditions"); Khan, 2008 U.S. Dist. LEXIS 76721, at *5-6 (noting that complaints may not be protected where "the objectionable comment is an isolated or passing incident"); Spadola v. N.Y. City Transit Auth., 242 F. Supp. 2d 284, 293 (S.D.N.Y. 2003) (granting summary judgment on plaintiff's retaliation claim because "no rational jury could find that, under the totality of the circumstances evidenced here, [a co-worker's] isolated allegedly harassing remark made during [a verbal altercation with plaintiff at work] constituted a sufficient ground to support a good faith, objectively reasonable belief that the offending conduct constituted a violation of Title VII, and that Spadola had thus engaged in a protected activity when he protested the comment as an unlawful employment practice").  However, this case can be distinguished from cases involving a single comment or isolated remark.  Although Jamal's behavior underlying plaintiff's complaint all happened on one day, plaintiff's complaint about Jamal's disrespectful behavior included making her wait in the car while he conducted his private business, making her an hour late to what she perceived as an important meeting for her career, and interrupting her presentation during the meeting.

13

several instances that he believed to be sexual harassment, and that it was this belief that caused him to make his complaints"); McGrory v. City of New York, No. 99 Civ. 4062 (FM), 2004 U.S. Dist. LEXIS 20425, at *30 (S.D.N.Y. Oct. 8, 2004) (denying defendant's motion for judgment as a matter of law on plaintiff's retaliation claim because "[w]hile the jury correctly concluded that there was insufficient evidence of a racially hostile work environment, the City has not shown that there was a reason for a layman such as McGrory to have known that such isolated acts were insufficient to establish his entitlement to relief"); Carter v. Rosenberg & Estis, P.C., No. 95 Civ. 10439 (DLC), 1998 U.S. Dist LEXIS 4010, at *34 (S.D.N.Y. Mar. 30, 1998) (denying defendant's motion for judgment as a matter of law on plaintiff's retaliation claim because plaintiff "adduce[d] sufficient evidence at trial - - albeit by a slim margin - - to support a finding that she believed reasonably and in good faith that she was opposing [unlawful sexual] harassment" when she complained about a co-worker's request for a kiss and subsequent hostile conduct towards her).

The Carter case is particularly instructive.  In Carter, plaintiff complained that a co-worker, Talisman, had "allegedly pointed to his cheek and indicated to Carter that he wanted a kiss.  She refused, and after that refusal, according the Carter, Talisman became hostile towards her, sulked, refused to accept work from her or perform work for her, and generally made her job difficult."  Carter, 1998 U.S. Dist LEXIS 4010, at *3.  Although a request for a kiss is on its face gender-based in nature, Carter admitted that she did not consider it sexual and that she did not use the word "sexual harassment" when she reported the incident nearly a month after it happened. Instead, she used the words "hostility" and "harassing" to describe the conduct.  "[W]hen pressed to explain her new view of Talisman's behavior -- a view that was itself perhaps a construct of litigation -- Carter once again responded by referring to the generally antagonistic actions on his part that appear to have been the actual bases for her complaint."  Id. at *27.  "[N]otwithstanding

the considerable evidence indicating that Carter lacked a good faith, reasonable belief that she was opposing unlawful sexual harassment," Judge Cote found that "regardless whether she understood [Talisman's request for a kiss] to be sexual or merely obnoxious, he presumably would not have made it if Carter were a man," and that plaintiff "presented at least some evidence" of harassment by Talisman "during the month after she spurned that gender-based advance." Id. at *30-31. Accordingly, Judge Cote held that "[i]n these circumstances, the Court cannot conclude that no reasonable jury could find that Carter had a good faith, reasonable belief that she was opposing unlawful harassment based on her gender when she complained about Talisman to the firm." Id. at *34.  Similarly, in this case, plaintiff did not explicitly refer to gender when she complained about Jamal's behavior to Durig and Mahaney in November 2001.  Rather, like Carter, plaintiff complained of a co-worker's generally antagonistic actions using words such as "abusive" and "disrespectful." (Tr. 33, 105.)  Although there was no quintessentially gender-based conduct in this case like a request for a kiss by a co-worker, the verdict here reflects that the jury believed plaintiff that Jamal would not have made her wait in the car while he conducted his private business, made her late to the meeting, and interrupted her presentation if she were not a woman.

Although I acknowledged that the issue was a close call when I denied defendant's motion for judgment as a matter of law before the case was submitted to the jury, (Tr. 472), after a thorough review of the record, I cannot conclude as a matter of law that the jury erred in finding that plaintiff engaged in protected activity when she complained to Durig and Mahaney about Jamal's conduct.  Under the totality of the circumstances presented, plaintiff's immediate and continuous complaints regarding Jamal's rude and disrespectful behavior at the meeting and her requests that the behavior be investigated supports the jury's conclusion that her complaints were based on gender, even though plaintiff never explicitly said that she was complaining of sex

discrimination.[8]  As stated by the Court in <u>Carter</u>, "[g]iven the ample evidence that would have supported a verdict for the defendants . . . the jury's choice between the arguments for the defendants and for [plaintiff] ultimately rested on an evaluation of her credibility." <u>Carter</u>, 1998 U.S. Dist LEXIS 4010, at *34.  The jury here found plaintiff to be credible and believed her testimony regarding these events.

The jury also had a legally sufficient evidentiary basis to find that plaintiff suffered a materially adverse action and that there was a causal connection between her engaging in the protected activity and the adverse action.  An employer's actions are "materially adverse" if they are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." <u>Burlington N. & Santa Fe Ry. v. White</u>, 548 U.S. 53, 57 (2006).  Retaliatory harassment, if sufficiently severe, may constitute an adverse employment action. <u>Richardson v. N.Y. State Dep't of Corr. Serv.</u>, 180 F.3d 426, 446 (2d Cir. 1999). "[P]roof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." <u>Gordon v. N.Y. City Bd. of Educ.</u>, 232 F.3d 111, 117 (2d Cir. 2000) (citation omitted).  "[A] plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action." <u>Gorzynski</u>, 596 F.3d at 110 (quoting <u>Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty.</u>, 252 F.3d 545, 554 (2d Cir. 2001)).

---

8 Although defendant relies on plaintiff's admission on cross-examination that she never complained to anyone that she was being subjected to gender discrimination, counsel's questions asked whether plaintiff ever complained of gender discrimination by Mahaney or Durig. (Tr. 291, 302.)  However, plaintiff's retaliation claim is based on her complaints regarding Jamal's behavior, not her subsequent complaints regarding Mahaney and Durig's conduct.

The testimony at trial was undisputed that Mahaney started to harass plaintiff immediately after she initially complained in November 2001 about Jamal's conduct during the Kingston meeting. Plaintiff testified that since the moment she complained about Jamal's conduct to Durig and Mahaney, "Mahaney turned against me and he has started to mock me, to undermine to broken English, to belittle and pester me . . . to subject me to increasing scrutiny, marginalization and criticism." (Tr. 35.) Plaintiff further testified that the Kingston meeting started "a long ordeal of harassment, intimidation and malicious retaliation that eventually forced [her] to withdraw from EAO in May 2003." (Tr. 33.) Plaintiff specifically stated that the Kingston meeting "start[ed] the problem . . . [and] exposed me to abusive behavior of Mr. M. Jamal and get continuous persecution from Mr. Mahaney." (Tr. 105.) Durig's testimony confirmed that plaintiff and Mahaney had a very good relationship when she first started in the Engineering Audit Office, but their relationship "went downhill" after the Kingston meeting. (Tr. 146-147, 172.) Due to the conflict between plaintiff and Mahaney, plaintiff was transferred to the supervision of Gorozdi. However, even after plaintiff was transferred to the supervision of Gorozdi, Gorozdi testified that Mahaney would not stop interfering with plaintiff's work. While under the supervision of Gorozdi, plaintiff testified that Mahaney "removed me from the training," "was following me all the time, criticizing me, having objections all the time," and "never stopped interfering in my work." (Tr. 104.) Eventually, Gorozdi requested that plaintiff be transferred out of his supervision because he "could not effectively accomplish the task that the Board charged [him] with [Mahaney] being involved in [his] supervision area." (Tr. 455.) Finally, the record reflects that Mahaney gave plaintiff negative evaluations on January 10, 2002 and March 21, 2002, and Durig gave plaintiff a negative and untimely evaluation on May 18, 2004. Mahaney's evaluations were voided on appeal and Durig's evaluation was partially reversed on appeal. Presented with

17

this evidence and the proper instruction, the jury found that the harassment suffered by plaintiff within the Engineering Audit Office was materially adverse and that the harassment was causally related to plaintiff's complaints regarding Jamal's conduct.

In light of defendant's "particularly heavy" burden on the instant motion, the Court cannot conclude that the jury's verdict was based on "a complete absence of evidence," or that there was "an overwhelming amount of evidence" in favor of defendant that compels the Court to set aside the jury's verdict in this case. AMW Materials Testing, Inc., 584 F.3d at 456. Accordingly, defendant's motion for judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure is denied.

## II.    Motion for a New Trial

Following a jury trial, "[a] court may grant a new trial 'for any reason for which a new trial has heretofore been granted in an action at law in federal court,' including if the verdict is against the weight of the evidence." Raedle v. Credit Agricole Indosuez, 670 F.3d 411, 417 (2d Cir. 2012) (quoting Fed. R. Civ. P. 59(a)(1)(A)). "A district court may grant a new trial pursuant to Rule 59 even when there is evidence to support the jury's verdict, so long as the court 'determines that, in its independent judgment, the jury has reached a seriously erroneous result or its verdict is a miscarriage of justice.'" AMW Materials Testing, Inc., 584 F.3d at 456 (quoting Nimely v. City of New York, 414 F.3d 381, 392 (2d Cir. 2005)). "On new trial motions, the trial judge may weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner." Raedle, 670 F.3d at 418 (citing United States v. Landau, 155 F.3d 93, 104 (2d Cir. 1998)). However, "trial judges must exercise their ability to weigh credibility with caution and great restraint, as a judge should rarely disturb a jury's evaluation of a witness's credibility, and may not freely substitute his or her assessment of the credibility of

witnesses for that of the jury simply because the judge disagrees with the jury." Id. (internal quotation marks and citations omitted).   A "high degree of deference" should be "accorded to the jury's evaluation of witness credibility, and . . . jury verdicts should be disturbed with great infrequency." Id.

### A.    Excessive Compensatory Damages

Defendant first argues that the jury's award of compensatory damages was excessive and therefore the Court should either order a new trial on damages or reduce the amount of plaintiff's damages award through remittitur.

> It is well established that the trial judge enjoys "discretion to grant a new trial if the verdict appears to [the judge] to be against the weight of the evidence," and that "[t]his discretion includes overturning verdicts for excessiveness and ordering a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur)." Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 433 (1996).   A conditional order of remittitur, requiring a plaintiff to choose either a new trial or a reduced verdict, may be granted where, inter alia, "the award is intrinsically excessive in the sense of being greater than the amount a reasonable jury could have awarded, although the surplus cannot be ascribed to a particular, quantifiable error." Shu-Tao Lin v. McDonnell Douglas Corp., 742 F.2d 45, 49 (2d Cir 1984) (citation omitted).   "Where there is no particular discernable error, we have generally held that a jury's damage award may not be set aside as excessive unless 'the award is so high as to shock the judicial conscience and constitute a denial of justice.'" Id. (quoting O'Neill v. Krzeminski, 839 F.2d 9, 13 (2d Cir. 1988)).

Lore, 670 F.3d at 176-77.

"In determining whether a jury's award is excessive, courts take into account awards rendered in similar cases, 'bearing in mind that any given judgment depends on a unique set of facts and circumstances.'" Olsen v. County of Nassau, 615 F. Supp. 2d 35, 45 (E.D.N.Y. 2009) (quoting Scala v. Moore McCormack Lines, 985 F.2d 680, 684 (2d Cir. 1993)).   "Emotional distress awards within the Second Circuit can generally be grouped into three categories of claims: garden variety, significant, and egregious." Olsen, 615 F. Supp. 2d at 46 (internal quotation

marks and citations omitted); see Rainone v. Potter, 388 F. Supp. 2d 120, 122 (E.D.N.Y. 2005)

("In the employment discrimination context, there appears to be a spectrum or continuum of

damage awards for emotional distress.") (internal quotation marks and citation omitted).

> In garden variety emotional distress claims, the evidence of mental suffering is generally limited to the testimony of the plaintiff, who describes his or her injury in vague or conclusory terms, without relating either the severity or consequences of the injury.  Such claims typically lack extraordinary circumstances and are not supported by any medical corroboration.  Garden variety emotional distress claims generally merit $30,000 to $125,000 awards.
>
> Significant emotional distress claims differ from the garden-variety claims in that they are based on more substantial harm or more offensive conduct, are sometimes supported by medical testimony and evidence, evidence of treatment by a healthcare professional and/or medication, and testimony from other corroborating witnesses.  Finally, egregious emotional distress claims generally involve either outrageous or shocking discriminatory conduct or a significant impact on the physical health of the plaintiff.  In significant or egregious cases, where there is typically evidence of debilitating and permanent alterations in lifestyle, larger damage awards may be warranted.

Olsen, 615 F. Supp. 2d at 46-47 (internal quotation marks and citations omitted).

The jury awarded plaintiff $100,000 in compensatory damages for emotional pain,

suffering, inconvenience, mental anguish, and loss of enjoyment of life.  Although defendant

argues that "the actual emotional damages suffered by plaintiff during her time within the EAO

division are confined to a two day period," the Court disagrees.  Plaintiff testified that she

suffered for "[o]ne year and a half, I don't know how many people could resist what I resist until I

collapsed." (Tr. 128.)  Plaintiff testified that she ultimately suffered a nervous breakdown in

March 2003 and that she suffers from chronic depression as a result of the harassment within the

Engineering Audit Office.  (Tr. 64, 66, 112, 125-128.)  Plaintiff was the only witness to testify at

trial about her emotional distress and she did not introduce any evidence regarding medical,

psychiatric, or psychological treatment for her depression.  In describing her first nervous

breakdown in March 2003, right before she decided to transfer out of the Engineering Audit Office, plaintiff testified:

> Mahaney was all over me all the time.  I couldn't stand it anymore.  Later on, to go to sleep for two days with the clothes on you and to go away out was to solve the problem.  I was to sleep forever.  In fact, the first breakdown never breakdown.  Nobody accepts depression before it's documented.  So I was thinking everybody would be sick in such a situation as I am for one year and a half.
>
> . . . I really was out of my mind.  So in that day I went home and with the clothes on me I start to sleep.  I didn't want to awake.  I was really like I jump into death.  I didn't know at the time that that was depression.  I haven't heard about it.  But I awake Monday with the conviction if I am not doing something I am very sick.  I have to solve the problem at any price.
>
> . . . The stress in what I was, it was hard to explain.  When you reach the point to go home, to sleep in your clothes for two days because I couldn't find any solution, it was really - - I didn't know what I have, but in my mind was that in a sick place, sooner or later, you'll be sick.  I didn't know how sick I was at that time.  So I put the transfer.  It was the only solution what I saw, to run away.

(Tr. 66, 112, 125-126.)   Plaintiff stated that "[t]his was the roots of my today chronic depression." (Tr. 127.)   Plaintiff further testified that she later suffered a "second breakdown," where she "was more than six months almost not leaving the house" and "sleeping 20 hours a day," which was also rooted "back [in] that period of time" at the Engineering Audit Office.   (Tr. 128.)

As plaintiff did not provide any medical evidence in support of her claim of emotional distress and testified in a general fashion about her chronic depression and nervous breakdowns, plaintiff's claim squarely falls within the category of garden variety emotional distress damages. Although at the high end, the jury's award of emotional distress damages was within the range of garden variety damages awarded in this jurisdiction.[9]   See DeCurtis v. Upward Bound Int'l, Inc., No. 09 Civ. 5378 (RJS), 2011 U.S. Dist. LEXIS 114001, at *12 (S.D.N.Y. Sept. 27, 2011) ("A

---

9 Relying on Moore v. Houlihan's Restaurant, Inc., No. 07-CV-03129 (ENV) (RER), 2011 U.S. Dist. LEXIS 64452, at *22 (E.D.N.Y. May 10, 2011), which in turn relies on Rainone v. Potter, 388 F. Supp. 2d 120, 122 (E.D.N.Y. 2005), defendant contends that the permissible range for garden variety damages is $5,000 to $35,000.   (Def.'s Mem. of Law, p. 19.)   However, the Court declines to upset the jury's award to follow these cases.

review of the relevant case law in this jurisdiction reveals that plaintiffs with garden-variety claims generally receive between $30,000 and $125,000.") (citation omitted); Olsen, 615 F. Supp. 2d at 46 ("Garden variety emotional distress claims generally merit $30,000 to $125,000 awards.").

Based upon the evidence presented by plaintiff at trial, the jury's award of $100,000 in compensatory damages to plaintiff does not shock the judicial conscience. See DeCurtis, 2011 U.S. Dist. LEXIS 114001, at *12-14 (awarding plaintiff $100,000 in garden variety emotional distress damages under Title VII where plaintiff "presented no medical evidence of her distress" but stated that she felt "constantly stressed," "like she was going to have a nervous breakdown," "humiliated," and "shocked and scared"). Accordingly, defendant's motion for a new trial or for remittitur based on an excessive award of damages is denied.

**B.      Plaintiff's Misconduct at Trial**

Second, defendant argues that the Court should order a new trial based on plaintiff's misconduct during the trial. "[A] party is entitled to a new trial when opposing counsel's conduct causes prejudice to that party . . . thereby unfairly influencing its verdict." Tesser v. Bd. of Educ., 370 F.3d 314, 321 (2d Cir. 2004) (quoting Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 51 (2d Cir. 1998)). "In reviewing counsel's misconduct for prejudicial effect, the Court must consider the totality of the circumstances including the nature of the comments, their frequency, their possible relevance to the real issue before the jury, the manner in which the parties and the court treated the comments." Hopson v. Riverbay Corp., 190 F.R.D. 114, 122 (S.D.N.Y. 1999) (internal quotation marks and citations omitted). The district court "possess[es] broad discretion to determine when the conduct of counsel is so improper as to warrant a new trial." Hopson, 190 F.R.D. at 122 (citing Pappas v. Middle Earth Condominium Assoc., 963 F.2d 534, 540 (2d Cir.

1992)). The Court assumes that misconduct by a *pro se* litigant at trial could be grounds for a new trial based upon the standard set forth above.

Defendant argues that plaintiff's "misconduct was improper, prejudicial and likely deprived the defendant of a fair trial." (Def.'s Mem. of Law, p. 25.) Specifically, defendant contends that plaintiff "consistently commented to the jury about the Court's ruling and excluded evidentiary matter," apologized for not calling Mahaney as a witness, repeatedly testified during her examinations of other witnesses, and referred to punitive damages (which were not available in this case) during her summation. (Id. at pp. 22-24.)

It is an understatement to say that conducting a jury trial with a *pro se* litigant is difficult. Here, the difficulty of the trial was exacerbated by plaintiff's English language ability. Plaintiff was permitted to present her testimony in a narrative format and she questioned four witnesses. Plaintiff clearly struggled to formulate questions and to understand the rules of evidence. The Court highly commends defendant's attorneys who treated plaintiff with dignity and respect throughout the proceedings despite these challenges. Such professionalism by Mr. Eichenholtz and Ms. Kessler, no matter what the outcome of the case, reflects well on them as attorneys and on our system of justice. The trial transcript reflects that plaintiff made improper statements in front of the jury throughout the proceedings. However, the Court finds that plaintiff's behavior was not intentional or egregious. Rather, plaintiff did the best she could to present her case to the jury and follow the Court's rulings. Likewise, the Court and defendant's counsel did the best we could to conduct a fair trial. The verdict rendered by the jury was not the result of plaintiff's improper conduct. The jury obviously found plaintiff to be a credible witness. Moreover, certain strategic decisions by defendant's counsel may have had an impact on the jury, such as not calling Jamal or Mahaney as witnesses and not cross-examining Moss, Campbell, or Gorozdi.

23

The trial record reflects that plaintiff repeatedly attempted to testify during her examination of witnesses and referenced the Court's rulings *in limine*.  Although plaintiff's conduct was improper, the Court finds that it was not sufficiently egregious and that the instructions given to the jury were sufficient to cure any prejudice to defendant.  In response to plaintiff's comments during the trial about exhibits that she was "allowed to use," the Court instructed the jury as follows:

> I just would like to make clear for the jury . . . before the trial there are meetings with the parties to determine what evidence will be admitted and what evidence both sides can agree to, to eliminate some of the delay.  So when Ms. Rosioreanu is saying what she is permitted to, what she is not permitted to, she is referring to those pretrial motions that were made.  She is not supposed to refer to those, but we are just explaining to the jury what those references are to.

(Tr. 88.)  Moreover, the Court did its best to stop plaintiff from testifying during her examinations of witnesses and to encourage plaintiff to ask questions.  The Court also instructed the jury that only plaintiff's "testimony under oath was evidence," that "arguments . . . by the plaintiff are not evidence," and that "[t]estimony that has been stricken or excluded is not evidence and may . . . not [be] considered by you in rendering your verdict."  (Tr. 505.)

The trial record also reflects that plaintiff stated in her direct testimony that "I'm very sorry I couldn't put Mahaney on the stand to show you - - ."  (Tr. 112.)  The Court promptly upheld defendant's objection and instructed the jury as follows: "She could have.  She didn't choose to.  Again, it needs to be clear for the record people make their choices about who to depose and who are witnesses."  (Tr. 112.)

Defendant argues that "the most egregious example of the plaintiff disregarding this Court's instructions and attempting to engender sympathy with the jury was her conduct toward the conclusion of her summation," where she referenced an award of punitive damages.  (Def.'s Mem. of Law, p. 24.)  The trial record reflects that plaintiff stated towards the end of her

24

summation that "when I started my case several years go in 2007 without any knowledge about the law I was so frustrated what I wanted.   I wanted to be in front of a jury to ask them to send a strong warning to DEP in order to stop this kind of discrimination from now to does call what I read in the books punitive damages."   (Tr. 498.)   The Court promptly upheld defendant's objection and instructed plaintiff, in front of the jury, that "there is no punitive damages you've been told" and "[y]ou cannot mention it."   (Tr. 499.)   Moreover, the Court properly instructed the jury that "[p]laintiff's damages may include compensatory damages or nominal damages" and that compensatory damages in this case include "only damages for emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life."   (Tr. 524.)

In light of the curative instructions, the Court finds that plaintiff's improper comments during the trial, which although frequent were not severe in nature, were not sufficiently prejudicial to warrant a new trial.   Accordingly, defendant's motion for a new trial based on plaintiff's misconduct at trial is denied.

## CONCLUSION

For the reasons set forth above, defendant's motion for judgment as a matter of law, or alternatively, for a new trial or for remittitur is denied.

SO ORDERED.

/Signed by Judge Lois Bloom/

LOIS BLOOM
United States Magistrate Judge

Dated: July 9, 2012
       Brooklyn, New York

25